**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

INSURANCE COMPANY OF GREATER
NEW YORK, as subrogee of Five Star Hotels,
LLC d/b/a Holiday Inn Parkway East,

        Plaintiff,

     vs.                   No.    2:11-cv-01078

FIRE FIGHTER SALES & SERVICE CO.,

        Defendant.

## FIRE FIGHTER'S MEMORANDUM  IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

In 2005, in response to the demands of its franchisor, Five Star requested Fire Fighter to submit a bid to install fire suppression sprinklers in Five Star's Holiday Inn Hotel, in Braddock Hills, Pennsylvania.  Although Fire Fighter proposed to install a newly added riser pipe to supply water to the sprinklers, the owner of Five Star requested Fire Fighter to connect the sprinkler lines to the pre-existing wet standpipe on the Monroeville side of the Hotel in order to save money.  Fire Fighter revised its proposal several times in accordance with the owner's wishes. Fire Fighter installed the sprinkler lines and connected them to the Monroeville standpipe in 2006.  Fire Fighter did not connect anything to the standpipe in the Pittsburgh stairwell and both standpipes continued to supply water to the fire hoses on either side of the building as originally designed and constructed.  In December 2008, when the doors in the Hotel stairwells were left open and stairwell pressurization fans were left operating, forcing volumes of freezing outside air into the Hotel stairwells, the standpipes in both stairwells froze and failed.  The top of the standpipe in the Pittsburgh stairwell was forced off causing thousands of gallons of water to be

released throughout the Hotel from the Pittsburgh side of the building.  There is no evidence that any water flowed from the minor failures in the Monroeville stairwell.

Following the water loss, Five Star submitted a claim to its insurance company, GNY, for its losses.  GNY hired an expert, performed an investigation, and denied Five Star's claim based on Five Star's failure to maintain the fire suppression system by failing to furnish heat to the stairwells.  Five Star sued GNY for its insurance proceeds, and GNY settled that claim.

Now, using the same engineer, GNY is attempting to blame the loss on Fire Fighter and recover the proceeds that it paid to Five Star.  GNY filed suit as the subrogor of Five Star claiming that Fire Fighter committed professional negligence and breached a contract with Five Star.  GNY has failed to produce evidence to establish the elements of either cause of action.

GNY cannot prove a professional negligence claim.  It cannot demonstrate that a professional engineer from Fire Fighter was involved in the work at the Hotel.  Even if there was a professional involved, GNY failed to present the required expert testimony to establish the standard of care for a professional engineer or a breach of that standard of care.

Similarly, GNY cannot establish the elements for a breach of contract claim.  GNY wants to rely on conditional boilerplate language in a proposal when the unrefuted testimony of Five Star and Fire Fighter establishes that the proposal does not set forth the mutual agreement of the parties.  Further, GNY cannot show that Fire Fighter breached the proposal or that a breach was a cause of Five Star's damages.  The undisputed facts are that a standpipe that Fire Fighter never touched froze two years after Fire Fighter did work at the Hotel because sub-freezing outside air was permitted to enter the interior space of the building and the building was not properly heated.  GNY's claims fail as a matter of law.

## II.    FACTUAL BACKGROUND

GNY, as subrogor of Five Star filed this claim for professional negligence and breach of contract against Fire Fighter.  (Second Am. Compl., Docket No. 98.)  Fire Fighter incorporates by reference the Concise Statement of Material Facts (hereinafter "SF") filed separately and concurrently as required by Local Rule 56(B)(1).  These facts will be repeated as necessary for clarity in the legal argument section below.

## III.    STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The party opposing the motion may not rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive the motion.   Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).   The non-moving party must instead "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file."  Id.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372 (2007).

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of

material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The Supreme Court in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), held that "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> at 324 (*quoting* FED.R.CIV.P. 56(c)). "Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule,' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> (*quoting* FED.R.CIV.P. 56(c) and (e)).

## IV.   LEGAL ARGUMENT

### A.   *Motion For Summary Judgment Regarding Count I (Professional Negligence)*

#### 1.   *No evidence has been produced that a professional engineer played any role in the Holiday Inn job, and GNY has failed to establish the duty element of a professional negligence claim.*

To prevail in any negligence action, a plaintiff must establish the following elements: (1) the defendant owed the plaintiff a duty; (2) the defendant breached the duty; (3) the plaintiff suffered actual harm; and (4) a causal relationship existed between the breach of duty and the harm. <u>Freed v. Geisinger Med. Ctr.</u>, 2006 PA Super 274, 910 A.2d 68, 72-73 (Pa. Super. Ct. 2006). In order to establish a claim for professional negligence under Pennsylvania law a plaintiff must demonstrate three basic elements: (1) employment of the professional or other basis for a duty; (2) the failure of the professional to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of damage to the plaintiff. <u>Kituskie v. Corbman</u>,

552 Pa. 275, 714 A.2d 1027, 1029 (Pa. 1998).  GNY has failed to produce any evidence in this case (1) that Rick Malady ("Malady"), Fire Fighter's only professional engineer, was involved in the job; (2) that Five Star had an expectation that a professional engineer would be involved in the job; or (3) that there was a legal or regulatory requirement for a professional engineer to be involved in the job.  There is simply no basis for a professional duty on Fire Fighter.  Fire Fighter relies on the facts set forth in Paragraphs 31 and 45-49 of its Concise Statement of Material Facts as well as this Court's April 24, 2012 Order in support of § A1 of this Brief in Support of Motion for Summary Judgment.

As an initial note, Count I of GNY's Second Amended Complaint is captioned "negligence."  However, this Court has limited Count I to a cause of action for professional negligence, to the extent that a professional engineer was involved in the Project.  (*See* 4/24/12 Transcript, p. 16, Docket No. 44) ("[if] there was no professional engineer involved, then there wouldn't be professional negligence because there was no professional involvement"); Id. at 18; ("I am going to permit this action to go forward, but limited to the role of the professional engineer that was involved.")

Discovery has been completed and there is no evidence that a professional engineer was involved in Fire Fighter's work at the Hotel.  To the contrary, Malady testified on behalf of Fire Fighter that he is the only professional engineer that worked for Fire Fighter.  (SF ¶ 45.)  Malady testified that he was not involved in the solicitation, design, or installation of the sprinkler piping at the Holiday Inn.  (SF ¶ 46.)  This testimony has not been refuted.  In fact, Malady testified that the only time he was even present at the Holiday Inn was half-way through installation of the sprinklers for an entirely unrelated purpose -- visiting an employee who was coming back to work after an injury.  (SF ¶ 47.)  Again, this testimony has not been refuted and there has been

no evidence produced that Malady was involved in any way in Fire Fighter's work. Furthermore, Five Star's owner, Ad Dhupar ("Dhupar"), had no expectation that a professional engineer would be involved in the job.  He testified that he does not even recall speaking to anyone at Fire Fighter regarding a professional engineer.  (SF ¶ 31.)  Because no professional engineer was involved, GNY cannot establish that Malady or any other professional engineer owed a professional duty to Five Star and Count I of GNY's Second Amended Complaint fails as a matter of law.

Additionally, GNY can point to no legal or regulatory duty for Malady or any other professional engineer to be in any way involved in the work Fire Fighter did at the Hotel. GNY's expert admitted at his deposition that there is no such legal duty for a professional engineer to be involved.  (SF ¶ 49); ("I stated I'm not aware of a legal duty.")[1]  Despite the fact that there was no engineer involved in the job and that there was no legal duty for a professional engineer to be involved, GNY attempts to boot strap a duty from the alleged contract to create a professional negligence claim.  However, this Court has held, repeatedly, that any duty arising out of the alleged contract must be addressed by the breach of contract claim (Count II) and that a negligence claim based on a duty arising solely out of the contract is barred by the gist of the action doctrine.  (*see e.g.* 4/24/12 Transcript, Docket No. 44.)  There simply is no evidence that Malady or any other professional engineer owed a professional duty to Five Star, and Count I of GNY's Second Amended Complaint fails as a matter of law.

---

[1] Even GNY's counsel admits that there is not a legal or statutory duty.  (GNY'S Response to Motion to Strike, p. 13, Docket No. 132.)

> **2. Even if Malady had been involved or had been required to be involved, there is no expert testimony regarding the applicable standard of care or that Malady breached the applicable standard.**

Under Pennsylvania law, a party generally must produce expert testimony that the defendant breached the standard of care for a profession in a professional negligence action. Cipriani v. Sun Pipe Line Co., 393 Pa. Super. 471, 574 A.2d 706, 710 (Pa. Super. Ct. 1990).  In professional liability cases, Pennsylvania law measures the standard of care "by the skill generally possessed and employed by practitioners of the profession." Lentino v. Fringe Employee Plans, Inc., 611 F.2d 474, 480 (3d Cir. 1979).  Cases where the engineering issues are not simple, expert testimony is required.  *See* US Airways, Inc. v. Elliott Equip. Co., 2008 U.S. Dist. LEXIS 76048, 8-11 (E.D. Pa. Sept. 29, 2008).   The expert witness in professional malpractice is necessary to establish the specific standard of care and to assist the jury in its determination of defendant's conformity to the relevant standard.   I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants, 2008 U.S. Dist. LEXIS 7001, 16-17 (E.D. Pa. Jan. 30, 2008). In this case, GNY has failed to offer expert testimony to establish the specific standard of care or that a professional engineer involved in the work Fire Fighter did at the Hotel breached the applicable standard of care.  Fire Fighter relies on the facts set forth in its Concise Statement of Material Facts in Paragraphs 50-51 as well as the Court's June 19, 2014 Order in support of § A2 of this Brief in Support of Motion for Summary Judgment.

Under Pennsylvania law, expert testimony is necessary in a professional negligence action such as this case to establish the specific standard of care and to assist the jury in its determination of a defendant's conformity to the relevant standard.  This Court has precluded GNY's expert from testifying that Malady, Fire Fighter's only professional engineer, breached the standard of care of a professional engineer.  (6/19/14 Transcript, p. 59-63, Docket No. 136.)

There have been no other experts identified by GNY and that phase of the case is closed. Therefore, GNY cannot offer the necessary expert opinion as to the applicable standard of care for a professional engineer involved in the job or whether a professional engineer breached that standard of care. However, to succeed on its professional negligence claim, an expert opinion is required. GNY's sole expert has been precluded by the Court from offering an opinion as to the negligence of Malady. Therefore, GNY cannot meet its burden and Count I of GNY's Second Amended Complaint fails as a matter of law.

Even if McGreal had not been precluded by the Court from offering an opinion that Malady breached a professional duty owed to Five Star, GNY's professional negligence claim still fails because McGreal failed to offer an opinion to establish the specific standard of care for a professional engineer involved in the job and failed to offer an opinion as to Malady's conformity to the relevant standard. It is anticipated that GNY will argue that McGreal offered an opinion that Malady's conduct fell outside of the applicable standard of care when McGreal opined that Malady did not oversee his employees or verify that there was heat in the Hotel's stairwells. (SF ¶ 50.) However, McGreal did not offer this opinion regarding professional duties owed by Malady to Five Star. Rather, McGreal opined that Malady breached a duty as an *owner* of Fire Fighter, not a duty as a professional engineer who was involved in the job. (SF ¶ 50.) He does not offer any opinion as to how Malady breached a professional duty owed to Five Star. Moreover, the Court has held that Malady did not have a professional duty merely because he was a professional engineer and because he was an owner of Fire Fighter. (6/19/14 Transcript, p. 59-63, Docket No. 136); ("The company's duty was to have it professionally -- a professional engineer do it. He was a professional engineer, had no independent duty -- at least I didn't see that foundation in the record -- to oversee every contract just because he's an owner of the

company.")   As the negligence claim has been limited to a professional negligence claim, McGreal's opinion that Malady was negligent as an owner is simply not relevant.  Even if it was relevant, McGreal could not identify a legal duty for the owner of a company to oversee a job of that company.  (SF ¶ 51.)

In summary, GNY's only expert has failed to offer an opinion as to the applicable standard of care or that a professional engineer breached that standard of care.  Moreover, the Court has precluded GNY's only expert from offering an opinion that Fire Fighter's only engineer breached a professional duty owed to Five Star.  Without the required expert testimony, there simply is no basis for a professional negligence claim, and Count I of GNY's Second Amended Complaint fails as a matter of law.

### B.      Motion for Summary Judgment Regarding Count II (Breach of Contract)

The essential terms of a contract include an offer, acceptance, consideration, and/or mutual agreement. Jenkins v. County of Schuylkill, 441 Pa. Super. 642, 658 A.2d 380, 383 (Pa. Super. Ct. 1995); Great N. Ins. Co. v. ADT Sec. Servs., 517 F. Supp. 2d 723, 736 (W.D. Pa. 2007).  In order to recover for damages, a plaintiff must show a causal connection between a breach and the loss. Exton Drive-In, Inc. v. Home Indem. Co., 436 Pa. 480, 261 A.2d 319 (1969); Adams v. Speckman, 385 Pa. 308, 122 A.2d 685 (1956); Taylor v. Kaufhold, 368 Pa. 538, 84 A.2d 347 (1951)); see also Brader v. Allegheny General Hosp., 64 F.3d 869, 878 (3d Cir. 1995).  GNY has failed to produce evidence to establish the terms of any mutual agreement between Five Star and Fire Fighter.  To the extent that a mutual agreement for the installation of sprinkler lines in the Hotel may be found, GNY has failed to produce evidence that "P.E. stamped drawings" was a term of that mutual agreement.  Finally, GNY has failed to produce evidence of a breach by Fire Fighter of the alleged contract.  Defendant relies on the facts set

forth in its Concise Statement of Material Facts in Paragraphs 9; 11; 22-30; 32-34; 70-71; 76-102; 105; 107-110; 112; 116-118; 119-120; and 23-124 in support of §§ B1, B2 and B3 of this Brief in Support of Motion for Summary Judgment.

"The proper interpretation of a contract is a question of law to be determined by the court in the first instance." J.W.S. Delavau, Inc. v. Eastern Am. Transp. & Warehousing, Inc., 810 A.2d 672, 681 (Pa. Super. Ct. 2002); Great N. Ins. Co. v. ADT Sec. Servs., 517 F. Supp. 2d 723, 735 (W.D. Pa. 2007).  A contract is enforceable when the parties reach mutual agreement, exchange consideration, and have set forth the terms of their bargain with sufficient clarity. J. W.S. Delavau, 810 A.2d at 681; Geisinger Clinic v. DiCuccio, 414 Pa. Super. 85, 606 A.2d 509, 512 (Pa. Super. Ct. 1992). "An agreement is sufficiently definite if the parties intended to contract with each other and if a reasonably certain basis exists upon which a court could grant an appropriate remedy." J. W.S. Delavau, 810 A.2d at 681; Geisinger Clinic, 606 A.2d at 512.

Under Pennsylvania law, the Court must construe a contract to give effect to its general purpose. Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973). Pennsylvania law requires the Court to "ascertain and give effect to the intent of the contracting parties." Murphy v. Duquesne University Of The Holy Ghost, 565 Pa. 571, 590-591, 777 A.2d 418 (Pa. 2001). "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 591 (Pa. 2001). The parole evidence rule precludes introduction of parol evidence when both parties intended a writing to represent the definite and complete statement of their agreement.  Bachman Co. v. Anthony Pinho, Inc., 1993 U.S. Dist. LEXIS 3050, 31 (E.D. Pa. Mar. 3, 1993).  However, the parol evidence rule has no application to a writing which does not state fully the entire agreement among the parties." Fountain Hill Millwork v. Belzel, 402 Pa. Super. 553, 587 A.2d 757 (Pa.

Super. 1991); Bachman Co. v. Anthony Pinho, Inc., 1993 U.S. Dist. LEXIS 3050, 35-36 (E.D. Pa. Mar. 3, 1993). If the terms of a contract are ambiguous, parol evidence is admissible to interpret the contract. SMS Demag, Inc. v. ABB Transmissone & Distribuzone, S.P.A., 2008 U.S. Dist. LEXIS 25637, 37 (W.D. Pa. Mar. 31, 2008). Distinct from the issue of ambiguity is the matter of whether a written document represents the entire agreement between the parties, an integrated writing. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. Pa. 1980). "The parol evidence rule is not applicable if the parties did not intend a written contract to set forth their full agreement." Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Inv., 951 F.2d 1399, 1405 (3d Cir. 1991). The question of whether a writing is integrated is one of law to be answered by the Court. Mellon Bank Corp., 951 F.2d at 1405; Otobai, Inc. v. Auto Tell Servs., 1994 U.S. Dist. LEXIS 7592, 10-11 (E.D. Pa. May 31, 1994).

### 1.   GNY has attempted to leverage the words on a Proposal into a breach of contract claim when there is no evidence that the Proposal memorializes a specific mutual agreement between Five Star and Fire Fighter.

In this case, Count II of GNY's Second Amended Complaint is based entirely on a written counter-Proposal. (See Second Amended Complaint, Docket No. 97, p. 10.) The written counter-Proposal attached to GNY's Second Amended Complaint does not memorialize what was the clear intent of the parties. There is no evidence that the counter-Proposal attached to GNY's Second Amended Complaint contains the terms of a mutual understanding and agreement between Five Star and Fire Fighter.

First, the document attached to GNY's Second Amended Complaint is on its face is not an integrated agreement. Fire Fighter drafted a Proposal to Five Star on August 1, 2005 (the "Proposal.") (SF ¶ 23.) Five Star did NOT accept the Proposal that Fire Fighter submitted. (SF ¶ 32.) Rather, on December 15, 2005, Five Star's majority shareholder, Ad Dhupar, made

material alterations to the Proposal including (1) adding the term "all approvals from the town/state/city as required;" (2) adding the text "at all levels" to the installation section; (3) changing the estimated schedule to "total job is targeted to finish by Feb. 28, 2006;" (4) modifying the cost investment to "$178,000;" (5) modifying the percentages in the terms and conditions section of the Proposal; and (6) adding the terms "submit all insurance papers" and "submit formal contract ASAP" to the end of the Proposal. Id. Under Pennsylvania law, a reply changing or adding to the terms of an offer may be either a rejection or counter-offer. Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 659 (3d Cir. 1988). "[A] reply to an offer which purports to accept but is conditional on the offeror's assent to additional terms to or different terms from those offered is not an acceptance but is a counter-offer." Restatement (Second) of Contracts § 59 (1981). Under Pennsylvania contract law, the material modifications made by Dhupar were a rejection of the Proposal and a counter-offer to Fire Fighter (the "counter-Proposal.")

Fire Fighter did not accept and sign the counter-Proposal. (SF ¶ 34.) There has been no evidence produced in this case that Fire Fighter ever signed the counter-Proposal or accepted the terms of that counter-Proposal. In fact, Dhupar noted on the counter-Proposal that a formal contract of the parties' agreement was to be drafted and submitted as soon as possible. (SF ¶ 32.) There has been no such formal contract produced in discovery as no formal contract was prepared let alone executed. Moreover, as shown below, all of the evidence in this case demonstrates that the terms of the counter-Proposal most definitely did not reflect the mutual understanding and agreement of the parties to the agreement. As the counter-Proposal in this case on its face is not a writing that memorializes the mutual agreement of the parties and no other writing has been produced, there is no integrated writing memorializing the terms of a

contract.  Therefore, this Court must look outside of the counter-Proposal to ascertain and give effect to the intent of the contracting parties.[2]

> **2.      The unrefuted evidence establishes that "P.E. stamped drawings" was not a term of the agreement between Five Star and Fire Fighter.**

As shown above, the counter-Proposal is not a writing that the represents the full and final agreement of the parties.  Looking outside the counter-Proposal, the clear and unrefuted evidence in this case establishes that the parties never contracted for or agreed to provide P.E. stamped drawings.  Rather, Fire Fighter offered to provide P.E. stamped drawings if the authority having jurisdiction ("AHJ"), Braddock Hills, required them.  (SF ¶¶ 25-30.)  "P.E. stamped drawings" was boiler-plate language put on the Proposal before it was determined whether the AHJ would require P.E. stamped drawings.  (SF ¶ 27.)  There is no evidence that Fire Fighter ever agreed to provide P.E. stamped drawings if the AHJ did not require them.

Mike Wessel was the salesman for Fire Fighter who prepared the Proposal and met with Dhupar.  (SF ¶ 11.)  Wessel testified that Fire Fighter agreed to provide P.E. stamped Drawings only if the AHJ required P.E. stamped drawings with the application for the permit.  (SF ¶ 26.)  Wessel discussed P.E. stamped drawings with Dhupar and advised him that under the Proposal, P.E. stamped drawings would only be provided if the AHJ required them.   (SF ¶ 26.)  Based on this conversation, Dhupar added the term "all approvals and everything will be submitted to the city as required" to his counter-Proposal.  (SF ¶¶ 32-33.)  He wrote these words on the counter-Proposal because it was not known "if Braddock Hills required P.E. stamped drawings or not." Id.  That determination would not be made until the design drawings had been prepared and

---

[2] Fire Fighter has never contested that it agreed with Five Star for the installation of sprinklers in the Hotel.  The terms of that agreement were not memorialized in a writing.  However, the mutual understanding of the parties that agreed upon the installation of the sprinklers can be determined by the testimony in this case.  GNY, who was not a party to that contract, wants to dispute this mutual understanding of the parties.

submitted to the AHJ for approval and permitting purposes.  This boiler-plate language was put

on proposals in case the AHJ required P.E Stamped drawings.  (SF ¶ 27.)  The determination as

to whether P.E. stamped drawings would be required was made after a proposal was given to a

potential client, but the term was discussed with the potential client as it was with Dhupar.  (SF

¶¶ 26-28.)

 All of Fire Fighter's witnesses testified consistently with Wessel that the agreement to

provide P.E. stamped drawings was a conditional term in the Proposal to be activated only if the

AHJ required P.E. stamped drawings.  (SF ¶ 29.)  None of the witnesses for Five Star disagreed

with or refuted the testimony of Fire Fighter's witnesses regarding P.E. stamped drawings, nor

has there has been any other evidence produced to refute this testimony.   In fact, Dhupar

testified:

> Q.     Did you talk to anyone at Fire Fighter about professional
> engineering stamps at all?
> A.     Vaguely, I remember there was some sort of discussion
> where I mentioned that all the necessary approvals had to be done,
> whether it is in Engineering or not, I do remember mentioning that
> part, they said we will take care of all the approvals.

(SF ¶ 30.)  Dhupar's testimony is entirely consistent and supportive of the testimony of Fire

Fighter's witnesses regarding P.E. stamped drawings.   Further, the evidence in this case

establishes that when the drawings were submitted, it was determined that Braddock Hills, the

AHJ, did not require fire protection system drawings to be stamped by a professional engineer.

(SF ¶ 70.)  To the contrary, Braddock Hills approved the design and installation and issued a

permit for the Project without P.E. stamped drawings.  (SF ¶ 71.)

 All of the evidence establishes that Fire Fighter and Five Star, the parties to the

agreement, knew that P.E. stamped drawings would only be submitted if required by the AHJ.

Yet GNY bases its breach of contract action on the failure to provide P.E. stamped drawings and

the engineering review that would come along with P.E. stamped drawings.[3]   Because no evidence has been produced to establish that P.E. stamped drawings were a term of any meeting of the minds and agreement between the parties, Fire Fighter is entitled to Summary Judgment as a matter of law at Count II of GNY's Complaint.

> **3.      There has been no evidence produced that a breach by Fire Fighter led to the loss in this case.**

In order to recover for damages pursuant to a breach of contract action, a plaintiff must show a causal connection between the breach and the loss." Exton Drive-In, Inc. v. Home Indem. Co., 436 Pa. 480, 261 A.2d 319  (1969); Adams v. Speckman, 385 Pa. 308, 122 A.2d 685 (1956); Taylor v. Kaufhold, 368 Pa. 538, 84 A.2d 347 (1951)); see also Brader v. Allegheny General Hosp., 64 F.3d 869, 878 (3d Cir. 1995).   It is a natural extension of the general rule that a plaintiff must plead damages resulting from an alleged breach of contract that damages for breach of contract are not recoverable unless there is a "causal relationship between the breach and the loss."  Id. quoting Robinson Protective Alarm Co. v. Bolger & Picker, 512 Pa. 116, 516 A.2d 299, 303 n. 9 (Pa. 1986).

GNY averred that Fire Fighter breached the counter-Proposal in four different ways:

> a.   By installing an automatic fire sprinkler system that was not in accordance with required state and local codes;
>
> b.   Failing to provide P.E. stamped Drawings;
>
> c.   Failing to provide shop drawings with all conventions, abbreviations and specified terminology used on the drawings, as necessary to understand and interpret the information contained therein; and
>
> d.   Failing to provide NICET Certified Technicians.

---

[3] Although the Second Amended Complaint avers that Fire Fighter breached the Proposal for three additional reasons, as shown below, even GNY's expert could not articulate how these alleged breaches led to the loss in this case and those baseless contentions must be discarded.

(Second. Am. Compl., Docket No. 97, p. 11.)   However, even assuming *arguendo* that the counter-Proposal was a contract and that Fire Fighter breached the contract in the manner averred by GNY, there is no evidence to establish a causal connection between the alleged breaches and the damages averred in the Second Amended Complaint.

Tom Ferguson, Five Star's night manager on duty, made inspection rounds on the night prior to the loss.  (SF ¶¶ 76-79.)  Mr. Ferguson observed that cold air was entering the stairwells from open outside doors and from the stairwell pressurization fans.  (SF ¶¶ 76-100.)   Fire Fighter's expert witness, Dr. David Bizzak opined that cold air infiltration from either the doors in the Hotel stairwells or from the stairwell pressurization fans or both could have and did caused the loss.[4]  (SF ¶ 101.)  GNY has not produced a single piece of evidence that refutes that cold air infiltration was the cause of the loss.  In fact, GNY's own expert testified that cold air infiltration from the stairwell doors and from the stairwell pressurization fans could have caused the standpipes to freeze.  (SF ¶ 102.)  There is no evidence that ties the alleged breaches of the counter-Proposal to the cold air infiltration in the stairwells.  Furthermore, there is no evidence that Fire Fighter caused the cold air infiltration into the stairwells.

The unrefuted evidence establishes that the failure in this case occurred on a standpipe that Fire Fighter never touched.  It is undisputed that the sprinkler lines installed by Fire Fighter were only connected to one of the two pre-existing standpipes.  (SF ¶ 9.)  At Dhupar's direction, the standpipe in the stairwell on the Monroeville side of the building was used to supply water to the newly installed sprinklers.  (SF ¶¶ 9, 22-23.)  All parties agree that Fire Fighter did not install or connect any piping to the standpipe located on the Pittsburgh side of the building.  (SF ¶ 9.)  Further, it is undisputed that the standpipe located on the Pittsburgh side continued to supply

---

[4] The purpose of the stairwell pressurization fans was to force volumes of outside air into the stairwells in the case of a fire to increase atmospheric pressure and prevent smoke from entering the stairwells so that they could be used as an emergency exit.  (SF ¶ 94.)

water to the original, pre-existing fire hose connections on that side of the building after Fire Fighter installed the sprinkler lines.  (SF ¶ 78.)  Also, it is undisputed that the Monroeville standpipe continued to supply water to the original, pre-existing fire hose connections on the Monroeville side of the building. (SF ¶ 77.)  Despite this unrefuted evidence, McGreal opined that Fire Fighter was responsible for the failure of the Pittsburgh standpipe because it was "hydraulically connected" to the Monroeville standpipe.  (SF ¶ 116.)  However, McGreal admits that "hydraulically connected" only means that the two standpipes drew water from the same source – the municipal water line -- and he admits that Fire Fighter did not have mechanical dealings with the standpipe on the Pittsburgh side.[5]  (SF ¶ 117-118.)   He testified:

> Q.   Those two separate standpipes are fed from the same water source?
> A.  Yes.
>  Q.  Is that what you mean by, "they are hydraulically connected"?
> A.  Yes.
> Q.   It's your understanding, though, that Fire Fighter never had any mechanical dealings or physical dealings with Pittsburgh standpipe?
> A.    I have no knowledge of them doing anything with that standpipe.

(SF ¶ 120.)  McGreal further admitted that Fire Fighter did not install any of the piping that actually failed and that all of the piping that failed was original construction piping.  (SF ¶ 119-120.)

The evidence produced in this case also demonstrates that all of the water that led to the loss flowed from the standpipe on the Pittsburgh side of the building, the standpipe that Fire

---

[5] The fact that the standpipes were hydraulically connected does not connect Fire Fighter's work to the Pittsburgh standpipe.  Saying that Fire Fighter's work involved the Pittsburgh standpipe is the equivalent of saying that a contractor who replaces a toilet is responsible for a water pipe in a shower freezing because the toilet and shower draw water from the same source.  Although the shower and toilet are hydraulically connected, the toilet and the shower serve entirely different purposes.

Fighter did not physically or mechanically touch.  All of the eye-witnesses who were present at the time of the loss stated that the water flowed from the standpipe on the Pittsburgh side of the building.  (SF ¶¶ 105, 110, 112.)  Frank Meikle, a guest at the Hotel, was evacuated down the stairs on the Monroeville side of the building and Meikle stated that there was no water flowing down the steps on the Monroeville side.  (SF ¶ 105.)  Brad Berry, the Hotel security guard, reported that there was a "torrent of foaming water pouring down" the Pittsburgh stairwell and that there was water flowing across the building from the Pittsburgh side to the Monroeville side. (SF ¶¶ 107-109.)  Berry did not observe any water flowing from the Monroeville standpipe or down the Monroeville stairwell.  (SF ¶ 110.)  Similarly, Firemen and first responders, Rick Patterson and Steven Lisovich, used the stairwell on the Monroeville side of the building when they were first on the scene in response to the emergency call and reported that there was no water flowing down the Monroeville stairwell.  (SF ¶ 112.)  Even GNY's expert, McGreal, could not identify any physical evidence that water flowed from the Monroeville standpipe other than the minor pipe failures.  (SF ¶ 123.)  Although he testified that there were minor failures of the pre-existing piping on the Monroeville side of the building, he could not testify that the ice plug on the Monroeville side melted sufficiently to permit water to flow.  (SF ¶ 124.)

In summary, there is no evidence connecting the alleged breaches of the counter-Proposal to the loss.  The unrefuted evidence demonstrates that the water that caused the loss flowed from the Pittsburgh standpipe.  There is no evidence that Fire Fighter altered the Pittsburgh standpipe or connected anything physically or mechanically to the Pittsburgh standpipe.  Simply, there is no evidence connecting the alleged breaches of the counter-Proposal or any work that Fire Fighter did to the loss in this case and Fire Fighter is entitled to Summary Judgment as a matter of law at Count II of GNY's Complaint.

C.    *Motion for Summary Judgment Regarding Damages*

1.    *Plaintiff failed to produce any expert evidence to establish its damages.*

To prove a breach of contract claim under Pennsylvania law, a plaintiff must demonstrate (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.   Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003).   Similarly, to succeed on a claim for professional negligence under Pennsylvania law a plaintiff must demonstrate that the failure of the professional to exercise ordinary skill and knowledge was the proximate cause of damage to the plaintiff.   Kituskie v. Corbman, 552 Pa. 275, 714 A.2d 1027, 1029 (Pa. 1998).   Evidence of damages is a required element of Counts I and II of Plaintiffs' Second Amended Complaint and GNY has failed to produce evidence to establish its damages.   Fire Fighter relies on the facts set forth in its Concise Statement of Material Facts in Paragraphs 138-140 in support of § C1 of this Brief in Support of Motion for Summary Judgment.

The relationship between GNY, as the insurer, and Five Star, as insured, is that of subrogor and subrogee. As Five Star's subrogee, GNY is entitled to no greater rights than Five Star would have had if Five Star had brought this action.   Puritan Insurance Company v. Canadian Universal Insurance, 775 F.2d 76, 80-81 (3d Cir. 1985); City of Philadelphia v. National Surety Corporation, 140 F.2d 805, 808-808 (3d Cir.1944) (applying Pennsylvania law); National Fire Insurance Company of Hartford v. Daniel J. Keating Co., 35 F.R.D. 137, 139 (W.D. Pa. 1964).   As is often stated, GNY "stands in the shoes" of Five Star. National Fire Insurance Company of Hartford v. Daniel J. Keating Co., 35 F.R.D. at 139.

In this case, GNY intends to produce at trial "evidence of damages of $9,692,229.87." (SF ¶ 139.)   However, the majority of GNY's alleged damages – $6.9M – is an amount that

GNY paid to Five Star for settlement of a declaratory judgment action brought by its insured, including settlement of a claim for bad faith insurance practices.  (SF ¶¶ 138-140.)  Fire Fighter clearly cannot be responsible for the bad faith claim.  Furthermore, GNY has not offered any expert testimony to establish the amount of damages suffered by Five Star as a result of the water loss.  The amount and extent of damages sustained by Five Star is clearly beyond the knowledge of a layman.  As such, Five Star would be required to present expert testimony if it brought suit against Fire Fighter.  Because GNY stands in the shoes of Five Star, it is also required to present expert testimony to establish the amount of its damages.  GNY has failed to identify an expert to testify as to the amount Five Star's damages.  As such, the evidence produced in discovery fails to establish GNY's damages and Fire Fighter is entitled to judgment as a matter of law.

## V.    CONCLUSION

For all of the foregoing reasons, Fire Fighter respectfully requests this Honorable Court to enter Summary Judgment in favor of Fire Fighter.

Respectfully submitted,

Dated: Monday, August 1, 2014          ROBB LEONARD MULVIHILL LLP


/s/ John A. Robb, Jr._____
John A. Robb, Jr., Esquire
BNY Mellon Center
500 Grant Street, 23rd Floor
Pittsburgh, PA  15219
Tel.: 412-281-5431
Fax: 412-281-3711