## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INSURANCE COMPANY OF GREATER<br>NEW YORK, as subrogee of Five Star Hotels,<br>LLC d/b/a Holiday Inn Parkway East,<br><br><br>Plaintiff,<br>v.<br><br>FIRE FIGHTER SALES & SERVICE CO.,<br><br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:11-1078 |

## AMENDED MEMORANDUM OPINION

**Conti, Chief District Judge**

### I.      Introduction

Pending before the court is the motion for summary judgment filed by defendant Fire Fighter Sales & Service Company's ("Fire Fighter") (ECF No. 139). Plaintiff, the Insurance Company of Greater New York ("GNY"), in its second amended complaint (ECF No. 97), asserts claims of professional negligence (Count I) and breach of contract (Count II) arising from the extensive water damage sustained by a hotel insured by GNY when a water-filled standpipe froze and burst. Fire Fighter seeks summary judgment in its favor with respect to both counts. This court has jurisdiction pursuant to 28 U.S.C. § 1332.

### II.      Factual Background

This action stems from a property damage claim filed by Five Star Hotels, LLC ("Five Star"), the owner and operator of the Holiday Inn Parkway East hotel (the "Hotel") located in Pittsburgh, Pennsylvania. Five Star purchased the Hotel in March 2005, intending to operate it

as a Holiday Inn franchise.  (Declaration of Ad Dhupar ("Dhupar Decl.") (ECF No. 142-2) ¶ 8.)

The Hotel was insured by GNY pursuant to a written insurance policy (policy number

6137M15022).  (Id. ¶ 5.)

At the time that Five Star purchased the Hotel, the Hotel's fire suppression system

consisted of a fire pump, two 6" standpipes (one each in the east and west stairwells),[1] and

several fire hose access points located on each floor.  (Combined Statement of Material Facts

("C.S.F.") (ECF No. 157) ¶ 5.)  As a condition of Five Star's franchise agreement, Holiday Inn

directed Five Star to upgrade the Hotel's fire suppression system to include an automatic

sprinkler system.  (Deposition of Ad Dhupar ("Dhupar Dep.") 31, (ECF No. 142-1)).  Dhupar

solicited bids from two companies, including Fire Fighter, to perform the necessary upgrades.

(Id. at 120-21.)

At some point in 2005, Fire Fighter employees Mike Wessel ("Wessel") and Eric Grien

met with Dhupar for an initial discussion and walk-through of the proposed project.  (C.S.F.

(ECF No. 157) ¶ 12.)  During the walk-through, Wessel noted the presence of the existing

standpipes in the Monroeville and Pittsburgh stairwells.  (Deposition of Mike Wessel ("Wessel

Dep.") 23, (ECF No. 142-5).)  Wessel observed that, although there were no heating mechanisms

located in the stairwells, they appeared to be heated by radiant heat from surrounding areas.  (Id.

at 23-24; Dhupar Decl. (ECF No. 147-1) ¶15.)  Dhupar advised Wessel that the stairwells had

not experienced any freezing problems over the past twenty years.  (Dhupar Dep. 154-55, (ECF

No. 147-1); Wessel Dep. 25-26 (ECF No. 147-5).)

Shortly thereafter, Wessel and Grien prepared an initial proposal and presented it to

Dhupar.  (C.S.F. (ECF No. 157) ¶ 18.)  The proposal quoted a price of $235,880.00 for the

---

[1] The parties have consistently referred to the East Stairwell as the "Monroeville Stairwell" and the West Stairwell as the "Pittsburgh Stairwell."  For convenience, the court will use the same references.

installation of the sprinkler system and a new standpipe to feed the sprinklers.  (Id. ¶ 19; February 23, 2005 Proposal ("Initial Proposal") (ECF No. 142-6) at 1-3.)  Dhupar responded that the Initial Proposal was too expensive and asked Wessel whether the sprinkler system could be fed from one of the existing standpipes.  (Dhupar Dep. 127-29, (ECF No. 147-1); Wessel Dep. 20-21, 40, (ECF No. 142-5).)  Wessel indicated that it could and agreed to prepare a modified proposal.  (Dhupar Dep. 126-27 (ECF No. 147-1).)

On August 1, 2005, Wessel submitted a modified proposal incorporating Dhupar's request that the sprinkler system be connected to an existing standpipe.  (August 1, 2005 Proposal ("August 1 Proposal") (ECF No. 142-8) at 1-4; Wessel Dep. 42-43, (ECF No. 142-5).) Other terms of the offer included a provision that shop drawings would be provided and that all work would be done in accordance with applicable state and local codes.  (August 1 Proposal (ECF No. 142-8) at 1.)  The proposal also contained a provision that Fire Fighter would provide "P.E. Stamped Drawings," a term indicating that a professional engineer would review and stamp the proposed project design.  (Id.)

On or about December 15, 2005, Dhupar met with Wessel and made several handwritten alterations to the August 1 Proposal.  (Wessel Dep. 47, (ECF No. 142-5).)  Dhupar's proposed changes included, *inter alia*, a requirement that Fire Fighter obtain "all approvals from the town/state/city as required," a change to the estimated completion date, and a modification of the total cost.  (December 15, 2005 Proposal ("December 15 Proposal") (ECF No. 142-11) at 1-3.) Dhupar also indicated in writing that Fire Fighter should submit a "formal contract ASAP."  (Id. at 3.)  Neither Dhupar nor Fire Fighter altered the provision in the proposal that P.E. Stamped Drawings were required.  (Id. at 1.)  Wessel agreed that the changes made by Dhupar were acceptable to Fire Fighter, and Dhupar signed the December 15 Proposal.  (Wessel Dep. 47-48,

(ECF No. 142-5).)   Despite Dhupar's handwritten notation that a "formal contract" would follow, no formal written contract was produced during discovery.  (ECF No. 140 at 12.)

Following his meeting with Dhupar, Wessel returned to Fire Fighter's offices and handed the signed December 15 Proposal to Dolores Moyle, the administrative employee at Fire Fighter who processed proposals and contracts.  (Wessel Dep. 49, (ECF No. 142-5).)  Wessel next met with Fire Fighter's operations manager, Tom Zandier ("Zandier"), to review the signed December 15 Proposal and determine "how we were to proceed, where we were supposed to start, what our job was."  (Deposition of Thomas Zandier ("Zandier Dep.") 16, (ECF No. 142-7).)  Zandier explained the general design requirements of the job to Jeff Hughes ("Hughes"), Fire Fighter's designer, who took over the design aspect of the job.  (Deposition of Jeff Hughes ("Hughes Dep.") 39, (ECF No. 142-12).)   Hughes took measurements of the building, incorporated those measurements into a design drawing, and prepared that drawing for submission to the relevant permitting authority.  (Id. at 41.)

At all times, Rick Malady was the only professional engineer working at Fire Fighter. (Deposition of Rick Malady ("Malady Dep.") 71-72, (ECF No. 142-14).)  Malady, however, had no involvement with the design process or installation of the sprinkler system and never reviewed the drawings or provided a P.E. stamp.  (Malady Dep. 97, (ECF No. 142-14).)

On March 2, 2006, Fire Fighter obtained a building permit from the Borough of Braddock Hills to construct the sprinkler system.  (Building Permit (ECF No. 142-17).)  Fire Fighter completed the project on or before July 3, 2006.  (July 3, 2006 Work Order (ECF No. 142-19).)

Consistent with Dhupar's request to utilize an existing standpipe, Fire Fighter physically connected the new sprinkler system to the standpipe located in the Monroeville Stairwell.

(Deposition of Timothy McGreal ("McGreal Dep.") 113-14, (ECF No. 142-4); Declaration of Timothy McGreal ("McGreal Decl.") (ECF No. 142-27) ¶ 6.)  Fire Fighter did not physically alter or connect anything to the standpipe on the Pittsburgh side of the Hotel. (McGreal Dep. 113, 115, (ECF No. 142-4).)  However, Timothy McGreal ("McGreal"), a professional engineer engaged as an expert witness by GNY, testified that the two standpipes were "hydraulically connected." (Id. at 113.)  McGreal explained:

> This isn't one fire sprinkler.  This is a fire sprinkler system, so the pressure that's being delivered to the system is being delivered throughout the system.  They're not discrete components.  They're not separate from each other.  They are connected as a system.

(Id. at 113-14.)

On the night of December 23, 2008, Thomas Ferguson ("Ferguson), the night manager on duty, made several inspection rounds of the Hotel and noted that "the whole Hotel was cold." (Deposition of Thomas Ferguson ("Ferguson Dep.") 38-39, 49, (ECF No. 142-40).)   In the course of his inspections, Ferguson walked up and down both the Pittsburgh and Monroeville Stairwells.  (Id. at 40.)   Around 7:00 P.M., Ferguson noticed that the exterior doors of both stairwells were propped open, allowing cold air to enter the stairwells.  (Id. at 43.)  Ferguson performed another inspection around 10:00 P.M. and noted that, although the exit doors were now closed, a pressurization fan on the Monroeville Stairwell appeared to be blowing cold air into the stairwell.  (Id. at 51.)  Around 1:00 A.M., Ferguson performed a final inspection and noted that the exit doors had again been left open and that the pressurization fan on the Monroeville side was still running.  (C.S.F. (ECF No. 157) ¶¶ 98-99.)

Early on the morning of December 24, 2008, Brad Berry ("Berry"), a security guard stationed at the hotel, responded to a customer's complaint that there was water dripping into his room.  (Declaration of Brad Berry ("Berry Decl.") (ECF No. 158-2) ¶ 5.)   Berry observed

approximately one foot of water running down the hallway on the 10th floor of the hotel from the Pittsburgh side of the building toward the Monroeville side.  (Id. ¶ 7.)  Berry observed similar conditions on several other floors of the hotel.  (Id. ¶ 8.)  Berry looked through the window of the doorway leading into the Pittsburgh Stairwell and observed water flowing down the stairwell to the height of the window.  (Id. ¶ 9.)  Because there was no water flowing down the Monroeville Stairwell, Berry used that stairwell to escort guests from the hotel.  (Id. ¶¶ 14-15.)  Two firemen who arrived on the scene were also forced to use the Monroeville Stairwell to enter the Hotel because the Pittsburgh Stairwell "was not passable" due to the water flowing down that side of the Hotel.  (Declaration of Rick Patterson ("Patterson Decl.") (ECF No. 158-3) at 1; Declaration of Steven Lisovich ("Lisovich Decl.") (ECF No. 158-4) at 1.)

On December 24, 2008, Five Star notified GNY about the water damage and requested insurance coverage.  (C.S.F. (ECF No. 157) ¶ 127.)  GNY promptly retained the services of CEC Forensic Engineers ("CEC") and Rimkus Consulting Group, Inc. ("Rimkus") to attempt to determine the cause of the damage.  (Id. ¶ 128.)  On January 9, 2009, CEC issued a report attributing the cause of the incident to frozen water in the sprinkler system as a result of insufficient heat in the stairwells.  (Id. ¶ 129.)  On September 15, 2009, Timothy McGreal, P.E. ("McGreal"), an engineer at Rimkus, issued a report in which he attributed the failure of the system to frozen water as a result of unheated stairwells and Five Star's failure to properly inspect, test, and maintain the sprinkler system.  (Id. ¶¶ 133-37.)  GNY ultimately settled Five Star's claim for $6.9 million dollars.  (Id. ¶ 138.)

### III.   Procedural History

On July 20, 2011, GNY, as subrogee of Five Star, initiated an action against Fire Fighter in the Allegheny County Court of Common Pleas.  (ECF No. 1-10.)  On August 19, 2011, the

matter was removed to federal court.  (ECF No. 1.)  GNY filed a first amended complaint on January 13, 2012, asserting claims for breach of contract, negligence, and product liability. (ECF No. 19.)

Fire Fighter filed a motion to dismiss GNY's negligence and product liability claims on February 2, 2012.  (ECF No. 22.)  On April 24, 2012, this court ruled that GNY's negligence claim could proceed, but only to the extent that GNY could state a claim for professional negligence based upon the involvement of a professional engineer.  (ECF No. 44 at 13-16.)  On August 6, 2012, the court dismissed GNY's product liability claim.  (ECF Text Order dated August 6, 2012.)

GNY filed a second amended complaint on November 15, 2013, reasserting claims for professional negligence and breach of contract.  (ECF No. 97.)  On August 1, 2014, Fire Fighter filed the instant motion for summary judgment.  (ECF No. 139.)  GNY responded to the motion on September 5, 2014 (ECF No. 145), and Fire Fighter filed a reply on September 19, 2014. (ECF No. 154.)  This motion is now fully briefed and ripe for review.

## IV.    Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED. R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially

on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. Celotex Corp., 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Id. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.     Discussion

### A.   Breach of Contract Claim

In order to prevail on a breach of contract claim pursuant to Pennsylvania law, a plaintiff must establish: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages caused by the breach. Haywood v. Univ. of Pittsburgh, 976 F.Supp.2d 606, 625 (W.D. Pa. 2013). A contract is enforceable when the parties reach a mutual understanding, exchange consideration, and set forth the terms of their bargain with sufficient clarity. Weaverton Transp. Leasing v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003). "Whether a contract exists is a factual issue for the trier of fact to determine unless there is no genuine issue

of material fact." York Excavating Co., Inc. v. Employers Ins. of Wausau, 834 F.Supp. 733, 740 (M.D. Pa. 1993).

"In ascertaining the intent of the parties to contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." Ingrassia Constr. Co. v. Walsh, 486 A.2d 478, 483 (Pa. Super. Ct. 1984). "If the parties agree upon essential terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date." Hartman v. Baker, 766 A.2d 347, 351 (Pa. Super. Ct. 2000). "'[A]n offer may be accepted by conduct and what the parties [do] pursuant to [the] offer is germane to show whether the offer is accepted.'" Id. (quoting Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993) (quoting Accu-Weather Inc. v. Thomas Broadcasting Co., 625 A.2d 75 (1993)(slip opinion at 5-6)).

Once a contract has been formed, a court must construe that contract to give effect to its general purpose. Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 478 F.2d 556, 560 (3d Cir. 1973). "'When a writing is clear and unequivocal, its meaning must be determined by its contents alone.'" Murphy v. Duquesne Univ. of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001) (quoting Felte v. White 302 A.2d 347, 351 (Pa. 2001)(quoting East Crossroads Center Inc. v. Mellon-Stuart Co., 205 A.2d 865, 866 (Pa. 1965)).

### 1.  Existence of  a Contract

GNY's breach of contract claim is based entirely on its contention that Fire Fighter failed to comply with several of the terms contained in the December 15 Proposal.  GNY maintains that this document, signed by both Wessel (on behalf of Fire Fighter) and Dhupar (on behalf of Five Star), set forth the essential terms of the agreement between those parties and demonstrated their intent to be bound by its contents.  In support of this position, GNY cites Wessel's testimony that

Dhupar and Wessel reviewed the contents of the December 15 Proposal together, discussed Dhupar's handwritten modifications, and agreed that all the terms were acceptable to each party. (Wessel Dep. 47-48, (ECF No. 142-5).)  GNY notes that Fire Fighter began to design and install the sprinkler system shortly after that meeting, suggesting by its conduct that it believed that a binding agreement had been reached.  See Schreiber, 627 A.2d at 808 ("[W]hen seeking to enforce an agreement, one may look to the 'conduct' of the parties to ascertain the acceptance of the agreement.").  Finally, GNY relies on the well-established principle that a binding contract may be formed even where the parties intend to adopt a more formal document at a later date, so long as the parties agreed to the essential terms of the agreement and intended them to be binding.  See, e.g., Hartman, 766 A.2d at 351.

Fire Fighter rejects GNY's contention that the December 15 Proposal was a binding contract, instead suggesting that the parties commenced the sprinkler project pursuant to a subsequent oral agreement containing terms that differed significantly from those set forth in the December 15 Proposal.  Fire Fighter contends that the December 15 Proposal was never binding because Dhupar's handwritten notations altered several material terms, the effect of which was to serve as both a rejection of Fire Fighter's prior offer and a new counter-offer.  See, e.g., Honeywell, Inc. v. American Standards Testing Bureau, Inc., 851 F.2d 652, 659 (3d Cir. 1988) (noting that, under Pennsylvania law, a reply to an offer that changes or adds to the terms of the offer is either a rejection or a counter-offer).  Fire Fighter maintains that it never accepted that counter-offer, although it failed to direct the court to any evidence to refute Wessel's testimony that the terms in Dhupar's counter-offer were acceptable to Fire Fighter.

A careful review of the record reveals ample evidence from which a trier of fact could conclude that Fire Fighter and Five Star intended to be contractually bound by the terms and

conditions of the December 15 Proposal.  As noted above, the signatures of both Wessel and Dhupar appear on the document.  (December 15 Proposal (ECF No. 142-11) at 1-3.)   Wessel testified that Fire Fighter had no objection to any of the modifications suggested by Dhupar and that he left his meeting with Dhupar with the understanding that the December 15 proposal was a binding contract.  (Wessel Dep. 47-48, (ECF No. 142-5).)   Based upon that understanding, Wessel promptly turned the project over to Fire Fighter's design team.  (Id. at 49; Zandier Dep. 16, (ECF No. 142-7).)   Zandier and Hughes immediately commenced with the design and installation of the sprinkler system without any further exchange of written proposals or adoption of a formal contract.  (Zandier Dep. 16, (ECF No. 142-7); Hughes Dep. 39, (ECF No. 142-12).)  Based on the foregoing, a jury could reasonably conclude that both Fire Fighter and Five Star intended to be bound by the December 15 Proposal.

### 2.  Breach

GNY contends that Fire Fighter breached its contract with Five Star in four ways: (1) by installing an automatic fire sprinkler system that was not in accordance with required state and local codes; (2) by failing to provide P.E. Stamped Drawings; (3) by failing to provide shop drawings; and (4) by failing to provide NICET certified technicians.  (Second Amended Complaint (ECF No. 97) at 11.)  Each of these allegations corresponds directly to a condition articulated in the December 15 Proposal.  (December 15 Proposal (ECF No. 142-8) at 1-2.)

Fire Fighter admits that it never provided Five Star with P.E. Stamped Drawings.[2]  As discussed above, Fire Fighter, however, denies that the December 15 Proposal was a binding

---

[2] In their briefs, GNY and Fire Fighter focus their arguments almost entirely on Fire Fighter's failure to produce P.E. Stamped Drawings.  To the extent that Fire Fighter addresses the other three alleged breaches, it does so exclusively in the context of causation.  (Fire Fighter's Memorandum in Support of Motion for Summary Judgment (ECF No. 140) at 15 n. 3.)  Nonetheless, the court's analysis with respect to the P.E. Stamped Drawings can be readily applied to the remaining allegations of breach.  As with the P.E. Stamped Drawings, each of the other three alleged breaches corresponds directly to a requirement contained in the December 15 Proposal, and each is disputed by Fire Fighter

contract and maintains that the parties had orally agreed that P.E. Stamped Drawings would only be provided if they were required by the local permitting authority, Braddock Hills. Wessel, Malady, and Hughes each testified that Dhupar had been informed that he would only receive P.E. Stamped Drawings if Braddock Hills required them to be provided.[3] (Wessel Dep. 65, (ECF No. 142-5); Hughes Dep. 16-17, (ECF No. 142-12); Malady Dep. 42-43, (ECF No. 142-14).)

In response, GNY points out that the plain language of the December 15 Proposal contains no such caveat with respect to the obligation to provide P.E. Stamped Drawings. GNY maintains that the language of that agreement is clear and unequivocal and, as such, "its meaning must be determined by its contents alone." Murphy, 777 A.2d at 429. GNY dismisses the contrary testimony supplied by Wessel, Malady and Hughes as impermissible extrinsic evidence that cannot be relied upon to alter the plain meaning of the parties' integrated written agreement. See, e.g., American Bank & Trust Co. v. Lied, 409 A.2d 377, 381 (Pa. 1979) (noting that parol evidence is forbidden "for the purpose of varying or contradicting the terms of a contract which both parties intended to represent the definite and complete statement of their agreement." (citing Corbin on Contract, § 573; In re Boyd's Estate, 146 A.2d 816 (Pa. 1959)).

Resolution of this issue is largely dependent upon the enforceability of the December 15 Proposal. Simply put, if a jury concludes that the December 15 Proposal is a binding contract, then the obligation to provide P.E. Stamped Drawings appears to be a clear term of that contract. Any contrary, unspoken understanding held by Fire Fighter would be irrelevant; after all, "it is their outward and objective manifestations of assent, as opposed to their undisclosed and

---

on the basis that the parties had reached a separate, oral agreement containing a different set of obligations and duties. As discussed above, these contentions are rife with disputed issues of material fact.

[3] Dhupar's own testimony states that he fully expected to receive P.E. Stamped Drawings and that he had no recollection of ever having been told that P.E. Stamped Drawings would only be provided in certain situations. (Dhupar Dep. 135-36, 141-42, (ECF No. 147-1).)

subjective intentions, that matter." Ingrassia Constr. Co., 486 A.2d at 483 (citing General Warehousemen and Employees Union Local No. 636 v. .C. Penney Co., 484 F.Supp. 130, 135 (W.D. Pa. 1980)).  Under such a circumstance, Fire Fighter's failure to provide P.E. Stamped Drawings would necessarily amount to a breach.

On the other hand, if a jury concludes that the December 15 Proposal is not a binding contract, and that the mutual understanding of the parties was expressed in a subsequent oral agreement, then there is a material factual dispute concerning the expectations of the parties with respect to P.E. Stamped Drawings.  While Wessel, Malady and Hughes each testified that P.E. Stamped Drawings would only be provided if required by Braddock Hills, Dhupar testified that he expected to receive P.E. Stamped Drawings.  Under either scenario, material factual disputes render summary judgment improper.

### 3.  Causation

In order to recover damages for a contractual breach, a plaintiff must also establish a "causal relationship between the breach and the loss."  Brader v. Allegheny General Hosp., 64 F.3d 869, 878 (3d Cir. 1995) (citing Robinson Protective Alarm Co. v. Bolger & Picker, 516 A.2d 299, 303 n. 9) (Pa. 1986)).  Whether causation has been established in a breach of contract action at the summary judgment stage is "'normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.'"  First Sealord Sur. v. Durkin & Devries Ins. Agency, 918 F.Supp.2d 362, 388 (E.D. Pa. 2013) (quoting Summers v. Certainteed Corp., 997 A.2d 1152, 1163-64 (Pa. 2010)).

In the instant case, Fire Fighter's expert witness, Dr. David Bizzak ("Dr. Bizzak"), opined that the sole cause of the loss was cold air infiltration into the stairwells as a result of the

stairwell doors being left open or the operation of the pressurization fans. (Report of Dr. David Bizzak ("Bizzak Report") (ECF No. 142-16) at 14-15.) More specifically, Dr. Bizzak attributed the freeze failure that occurred at the Hotel to several factors including: the unrestricted infiltration of cold outside air into the stairwells; Five Star's failure to take prompt corrective actions to stop air flow into the stairwell; Five Star's failure to maintain the pressurization fans; Five Star's failure to maintain sufficient heat in adjoining rooms to heat properly the stairwells; and Five Star's failure to train properly its staff to respond to emergencies involving the sprinkler system. (Id. at 14-15.) Dr. Bizzak stated that the stairwells, although not directly heated, would normally retain sufficient passive heat from adjoining rooms to ensure that the standpipes would not freeze. (Id.) Finally, Dr. Bizzak opined that "[n]o component of the automatic sprinkler system installed by [Fire Fighter] failed or malfunctioned during the event"; "[n]o aspect of the design or installation of the [sprinkler] system was a causal factor in the December 24, 2008 standpipe freeze failures and subsequent water loss"; and that the standpipes would have frozen and burst on the morning of December 24, 2008, due to cold air infiltration even in the absence of the sprinkler system. (Id. at 15-16.)

In contrast, McGreal attributed the frozen standpipe primarily to Fire Fighter's negligence in failing to verify that the sprinkler system would be located in an area with an adequate and reliable heat source. (Report of Timothy McGreal ("McGreal Report") (ECF No. 147-8) at 12.) According to McGreal, applicable state and local codes require that all portions of a "wet" sprinkler system, such as that installed by Fire Fighter, must be located in areas that are maintained at or above 40 degrees Fahrenheit. (Id. at 9-10.) Malady, the only professional engineer employed by Fire Fighter, acknowledged that he was aware that a wet sprinkler system should not be installed in an unheated area or an area that would be exposed to temperatures

below 40 degrees.  (Malady Dep. 50, 147, (ECF No. 147-3).)  Consequently, McGreal opined that the incident would not have occurred if Fire Fighter had complied with applicable codes or if Malady had carefully reviewed the drawings.  (McGreal Report (ECF No. 147-8) at 12.)  Finally, McGreal dismissed Fire Fighter's contention that it could not have caused the accident because it never physically altered the Pittsburgh standpipe, explaining that the two standpipes were not distinct components, but parts of a single integrated system with shared water pressure throughout. (McGreal Dep. 113-14, (ECF No. 142-4).)

 As a general proposition, "[a] factual disagreement between experts is a matter for the jury to resolve."  Hartle v. FirstEnergy Generation Corp., No. 08-1019, 2014 WL 1317702, at *7 (W.D. Pa. Mar. 31, 2014) (citing Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1216 (3d Cir. 1993) ("'[I]n a battle of the experts, the factfinder 'decide[s] the victor.''") (alteration in original) (quoting Mendes-Silva v. United States, 980 F.2d 1482, 1487 (D.C. Cir. 1993))).  After carefully considering the opinions offered by both experts and the underlying facts supporting those opinions, the court concludes that a genuine issue of material fact exists with respect to whether Fire Fighter's alleged breach caused the damage sustained by the Hotel. Accordingly, summary judgment is unwarranted.  See, e.g., Edwards Sys. Tech. Inc. v. Digital Control Sys., Inc., 99 F. App'x 911, 921 (Fed. Cir. 2004) ("[A] classic 'battle of the experts' . . . renders summary judgment improper.); Rooney v. City of Phila., 623 F.Supp.2d 644, 656 (E.D. Pa. 2009) (denying summary judgment because a "battle of the experts" created a genuine issue of material fact.").

### 4.  Damages

Finally, Fire Fighter contends that it is entitled to summary judgment because GNY "has not offered any expert testimony to establish the amount of damages suffered by Five Star as a

result of the water loss." (ECF No. 140 at 20.)  In order to prove damages, "a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 226 (3d Cir. 2003) (quoting ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 668 (3d Cir. 1998)).  "'At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor.'" Id. (quoting ATACS Corp., 155 F.3d at 669 (quoting Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1988)).  Fire Fighter contends that GNY failed to adduce sufficient evidence to meet this standard.

Contrary to Fire Fighter's contention, there is no requirement that damages in a breach of contract action be established by expert testimony.  See, e.g., Western Show Company, Inc. v. Mix, 173 A. 183 (Pa. 1934) (allowing expert testimony as to damages in a breach of contract case where there is no other "reasonably safe basis" for measuring damages); Mass. Bonding & Ins. Co. v. Johnston & Harder, Inc., 22 A.2d 709, 714 (Pa. 1941) (same).  Based upon the evidence of record, it is apparent that Five Star suffered significant property damage and lost income as a result of the frozen standpipe.  GNY may attempt to prove the amount of damages without expert testimony at trial by presenting, *inter alia*, documentation of repair costs, estimates, expenses, and any other relevant evidence.  "Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." Haywood v. Univ. of Pittsburgh, 976 F.Supp.2d 606, 645 (W.D. Pa. 2013) (citing Thorsen v. Iron and Glass Bank, 476 A.2d 928, 931 (Pa. Super. Ct. 1984)).  Consequently, "'[a] grant of summary judgment on the sole basis of absence of provable damages . . . is generally improper.'" Norfolk Southern Ry. Co. v. Pittsburgh & West Virginia R.R., No. 11-1588, 2014 WL 2808907, at *19 (W.D. Pa. June 19, 2014) (quoting Thorsen, 476

A.2d at 931); see Zeno v. Ford Motor Co., Inc., 480 F.Supp.2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages.").

### 5. Conclusion

As set forth above, the court finds that there are disputed issues of material fact with respect to each of the elements of GNY's breach of contract claim.  Fire Fighter's motion for summary judgment with respect to this claim is denied.

### B.  Professional Negligence Claim

To prevail in any negligence action in Pennsylvania, a plaintiff must prove that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached the duty; (3) the plaintiff suffered actual harm; and (4) a causal relationship existed between the breach of duty and the harm. Freed v. Geisinger Med. Ctr., 910 A.2d 68, 72-73 (Pa. Super. Ct. 2006).  In the context of professional negligence, the plaintiff must prove that the defendant's conduct fell below the relevant standard of care applicable to the professional service at issue.  Merlini v. Gallitzin Water Auth., 934 A.2d 100, 104 (Pa. Super. Ct. 2007).  In most cases, this determination requires expert testimony because the negligence of a professional encompasses matters not within the ordinary knowledge and experience of laypersons.  Id. (citing Yee v. Roberts, 878 A.2d 906, 912 (Pa. Super. Ct. 2005)).

Where a plaintiff alleges that the defendant acted negligently in the course of satisfying a contract, a court must "'examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort.'"  Smith v. Lincoln Ben. Life Co., No. 08-1324, 2009 WL 789900, at *20 (W.D. Pa. Mar. 23, 2009) (quoting Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F.Supp.2d 644, 651 (W.D. Pa. 1999)).  If the "gist of the action" is grounded in a contractual

relationship, a plaintiff will ordinarily be barred from pursuing an action for negligence based on the same conduct that formed the basis for the breach of contract claim.  USX Corp. v. Prime Leasing, Inc., 988 F.2d 4343, 440 (3d Cir. 1993).  The gist of the action doctrine applies to tort claims: "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract."  Hults v. Allstate Septic Systems, LLP, No. 06-0541, 2007 WL 2253509, at *10 (M.D. Pa. Aug. 3, 2007) (citing Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005)).  The principle underlying the doctrine is that a tort action derives from "the breach of duties imposed as a matter of social policy," whereas a breach of contract action stems from "the breach of duties imposed by mutual consensus." Redevelopment Auth. of Cambria County v. Int'l Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996).

In Pennsylvania, an exception to the gist of the action doctrine exists in the context of negligence claims against certain licensed professionals.  See, e.g., Rapidigm v. ATM Mgmt. Serv. LLC, 63 Pa. D & C. 4th 234 (Pa. Com. Pl. 2003).  In Rapidigm v. ATM Mgmt. Serv. LLC, 63 Pa. D & C. 4th 234 (Pa. Com. Pl. 2003), the court explained:

> Under settled Pennsylvania case law, a client may bring both a contract action and a tort action against a professional based on allegations that he or she failed to provide the client with professional services consistent with those expected of the profession . . . .
>
> No Pennsylvania courts have applied any of the doctrines barring tort recovery in relationships arising out of a contract (including the gist of the action doctrine), to claims involving a professional's failure to exercise the proper standard or care . . . . The application of the gist of the action . . . doctrine . . . would be inconsistent with recent case law . . . which gives a broad reading to prior case law allowing a client to bring

18

> both breach of contract and professional negligence actions based on the
> professional's failure to exercise proper skill and care.

Id. at 240-41 (citations omitted).  Relying on this principle, courts have refused to apply the doctrine to professional negligence claims where "the issue is whether Defendants were negligent by not exercising the skill and knowledge normally possessed by members of their profession, not whether Defendants breached a contract that existed between the parties." Sherman v. John Brown Ins. Agency Inc., No. 14-572, 2014 WL 3855023, at *8 (W.D. Pa. Aug. 5, 2014).  On the other hand, where the focus of the negligence claim is simply whether the professional did something that they were contractually required to do, courts have continued to apply the doctrine.  See, e.g., Greenwood Land Co. v. Omnicare, Inc., No. 09-686, 2011 WL 33027, at *4 (W.D. Pa. Jan. 5, 2011) ("The negligence claims advanced against Equis are, in reality, claims that lie within the parameters of the Services Agreement.  The focus of Omnicare's claims does not implicate the skill, expertise, or special knowledge that Equis brought to bear . . . but instead rests on whether Equis did what it was contractually bound to do."); Hults, 2007 WL 2253509 at *10 ("In this case, the plaintiffs have failed to establish a breach of any duty imposed by social policy as opposed to mutual consensus.  Their claims . . . derive from the contract entered into with Allstate . . . .  Therefore, the plaintiff's claims are also barred by the gist of the action doctrine.").

The court addressed this issue at length at the oral hearing on Fire Fighter's motion to dismiss.  (ECF No. 44.)  Relying on Rapidigm, the court permitted GNY's negligence claim to go forward, but only to the extent that it was based on the "activities" and "role of the professional engineer that was involved."  (ECF No. 44 at 16, 18.)  The court explained:

> [I]f it turns out that a professional engineer is not involved, is not
> required for these kinds of things . . . and there was no professional

> engineer involved, then there wouldn't be professional negligence because there was no professional involvement.
>
> [I]t might be that there's a breach of contract then because you were required to have a professional engineer involved and you didn't provide the professional engineer.

(Id. at 18.)  The court cautioned that GNY's professional negligence claim might not survive summary judgment if it turned out that a professional engineer was never involved in the sprinkler project at all.  (Id. at 19.)

With discovery now complete, the record clearly establishes that the only professional engineer employed by Fire Fighter never took any role in the design or installation of the sprinkler system at the Hotel.  (Malady Dep. 97, (ECF No. 142-14).)  Critically, GNY has failed to identify any duty or obligation imposed by law, regulation, or social policy that would *require* a professional engineer to be involved in the design and installation of such a system in the absence of a contract.  (McGreal Dep. 297, 300, (ECF No. 142-4).)  Thus, to the extent that Five Star expected to receive professional engineering services, that expectation derived entirely from the language in the December 15 Proposal indicating that P.E. Stamped Drawings would be provided.  As such, the gravamen of this action is not that Malady exercised his professional skill in a manner that fell short of the standards of his profession, but that Fire Fighter failed to do something that it was contractually required to do.  Under this narrow set of facts, the court concludes that GNY's professional negligence claim "essentially duplicates [its] breach of contract claim [and] is wholly dependent on the terms of the contract."  Hults, 2007 WL 2253509, at *10.  Accordingly, Fire Fighter is entitled to summary judgment with respect to this claim.

**V.     Conclusion**

Because a genuine issue of material fact exists concerning each of the elements of GNY's breach of contract claim (Count II), Fire Fighter's motion for summary judgment with respect to Count II is denied.  With respect to GNY's professional negligence claim (Count I), summary judgment is granted in favor of Fire Fighter on the basis of the gist of the action doctrine.[4]  An appropriate order follows.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated:  July 27, 2015

---

[4] GNY also filed a motion to strike (ECF No. 149) and a "motion to deem facts admitted" (ECF No. 161).  In its motion to strike, GNY primarily argues that several exhibits relied on in Fire Fighter's concise statement of material facts contain inadmissible hearsay.  GNY also asserts that several affidavits initially submitted by Fire Fighter were unsworn.  The court notes that Fire Fighter corrected the latter omission by re-submitting properly sworn affidavits, and that the court did not find it necessary to consider any hearsay statements in the course of ruling on Fire Fighter's summary judgment motion.  Consequently, GNY's motion to strike is denied as moot.  GNY's motion to deem facts admitted is similarly denied.